IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **v.** | § | **PE:22-CR-00427-DC** |
| | § | |
| **(1) LITSSON ANTONIO PEREZ-GALLAN.** | § | |

## MEMORANDUM OPINION

Before *Bruen*, the Second Amendment looked like an abandoned cabin in the woods. A knot of vines, weeds, and roots, left unkempt for decades, crawling up the cabin's sides as if pulling it under the earth. Firearm regulations are that overgrowth. Starting with the Federal Firearms Act in 1938, laws were passed with little—if any—consideration given to their constitutionality. That is, until the Supreme Court intervened in *Bruen*.

No longer can lower courts account for public policy interests, historical analysis being the only tool. But after growing unchecked for almost 100 years, today's tangle of gun laws has left lower courts with a gordian knot. And after engaging with this Nation's tradition of firearm regulations several times already, the Court's unanswered question is whether *Bruen* demands lower courts manicure the Second Amendment's landscape by scalpel or chainsaw.

## BACKGROUND

The facts are simple. Defendant Litsson Antonio Perez-Gallan was driving an 18-wheeler near the Mexico-United States border in Presidio, Texas when he entered a border patrol checkpoint. After Defendant was directed to a secondary inspection area, he was

asked whether he was armed. Defendant said yes; he had a pistol with him. Defendant consented to a search, and border patrol agents found the pistol in Defendant's backpack.

Agents also found a Kentucky state court order in Defendant's wallet ("Court Order"). The Court Order outlined Defendant's conditions of release stemming from his May 2022 arrest for assault. The Government later discovered a separate restraining order against Defendant from a Kentucky family court ("Restraining Order"). Defendant was indicted in June 2022 for one count under 18 U.S.C. § 922(g)(8), which makes it a crime to possess a firearm while subject to a court order.

Defendant moved to dismiss the indictment on August 25, 2022. After multiple continuances and extensions of time to respond, the Government responded to Defendant's motion in early October. Yet even though the Court has consistently reiterated after *Bruen* that the Government must prove through a historical inquiry that the challenged regulation complies with this Nation's tradition, the Government's response did not analyze any history even close to 1791. The Government's authorities closest to 1791 were the Militia Act of 1662 and a Fifth Circuit decision from 2001, leaving some 339 years of intervening history unaddressed. As a result, the Court ordered the parties to submit supplemental briefing on various issues, which the parties filed on October 28, 2022.

## DISCUSSION

Before reaching § 922(g)(8)'s constitutionality, the Court must resolve a threshold issue—whether § 922(g)(8) even applies. For § 922(g)(8) to apply, the underlying state court order must:

> (A) have been issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

    (B) restrain such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

    (C) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.[1]

    The Government acknowledges it has no proof Defendant had actual notice, the opportunity to participate, or was even present when the Restraining Order was issued, so the Court addresses only the Court Order. Defendant's Court Order prohibited him from "threatening to commit or committing acts of domestic violence or abuse against the alleged victim or other family or household member."[2] Defendant argues that because the Court Order's language doesn't "*explicitly* prohibit[] the use, attempted use, or threatened use of physical force," § 922(g)(8) is not applicable.[3]

    Yet the Fifth Circuit has held that a court order need not perfectly match § 922(g)(8)'s language.[4] Indeed, in line with the First, Fourth, Ninth, and Eleventh Circuits, respectively, the Fifth Circuit reasoned, "if the commonly understood definitions of terms in the protective order include acts involving 'physical force,' the protective order is sufficient to support a conviction under § 922(g)(8)."[5]

    Defendant's Court Order prohibited him from committing or threatening to commit "abuse"—which is commonly understood to include "violent acts involving physical force

---

[1] § 922(g)(8)(A)–(C) (the subsection (C)(i) alternative is not applicable here, so only subsection (C)(ii) is listed).
[2] Doc. 46, Ex. 1.
[3] Doc. 45 at 9.
[4] *United States v. McGinnis*, 956 F.3d 747, 760 (5th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 134, 141 S. Ct. 1397 (2021); *accord United States v. Bostic*, 168 F.3d 718, 722 (4th Cir. 1999); *United States v. Coccia*, 446 F.3d 233, 235, 241 (1st Cir. 2006); *United States v. DuBose*, 598 F.3d 726, 731 (11th Cir. 2010) (per curiam); *United States v. Sanchez*, 639 F.3d 1201, 1205 (9th Cir. 2011).
[5] *Id.*

within the [statutory] definition."[6] Thus, following the Fifth Circuit's precedent, the Court

finds Defendant's Court Order satisfies § 922(g)(8)'s required elements.

## I.     The Second Amendment and *Bruen*'s new framework.

The Second Amendment provides: "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be

infringed."[7] In *Heller*, the Supreme Court held that the Second Amendment protects the

right to possess a firearm in the home for self-defense.[8] And just last term, in *New York State*

*Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court held "consistent with *Heller* and

*McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry

a handgun for self-defense outside the home."[9]

Before *Bruen*, courts of appeals had "coalesced around a 'two-step' framework" when

assessing Second Amendment claims, combining a historical analysis with means-end

scrutiny.[10] For the first step, the court would establish the Second Amendment's original

scope through a historical analysis.[11] If the regulated conduct fell outside the Amendment's

original scope, "the analysis can stop there; the regulated activity is categorically

unprotected."[12] But if not outside the Amendment's scope or "inconclusive," the court

would proceed to step two.[13]

---

[6] *Id.* (quoting *Coccia*, 446 F.3d at 242).
[7] U.S. Const. Amend. II.
[8] *D.C. v. Heller*, 554 U.S. 570 (2008).
[9] 142 S. Ct. 2111, 2122 (2022).
[10] *Id.* at 2125.
[11] *E.g.*, *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017).
[12] *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012).
[13] *E.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019).

In step two, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."[14] If the "core" Second Amendment right—self-defense in one's home—was burdened, the court would apply strict scrutiny.[15] Otherwise, it would apply intermediate scrutiny, considering whether the Government had shown that the regulation is "substantially related to the achievement of an important governmental interest."[16]

But in *Bruen*, Justice Thomas stated the two-step approach was "one step too many."[17] In its place, Justice Thomas enumerated a new standard courts must follow:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[18]

So the threshold question is whether the Second Amendment's plain text covers Defendant's conduct.

## II. *Bruen*'s first step: "possessing" a firearm under the Second Amendment's plain text.

Defendant is charged with violating 18 U.S.C. § 922(g)(8), which, as stated above, prohibits possession of a firearm by any person who is subject to a court order that:

> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or

---

[14] *Id.*

[15] *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017).

[16] *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012).

[17] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

[18] *Id.* at 2129–30.

engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C) (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

The Court has already answered the question of whether "keep and bear arms" includes possession of a firearm—it does. According to Justice Scalia in *Heller*, to "keep arms" means to "have weapons." The plain meaning of "have" is "to be in possession of."[19] And the Government doesn't contest this interpretation. Thus, the Second Amendment's "keep and bear arms" language plainly encompasses possession.

*Bruen*'s first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm. Because the Constitution presumptively protects possessing a firearm, § 922(g)(8)'s constitutionality hinges on whether regulations prohibiting those subject to a protective order from possessing a firearm align with the Nation's historical tradition of firearm regulation.

### III.   *Bruen*'s second step: the historical evidence for protective orders.

The Government must now show that § 922(g)(8) complies with the historical understanding of the Second Amendment.[20] According to *Bruen*, the historical inquiry has two forms—one that is straightforward and one reasoned through analogy. For example, if a challenged regulation addresses a "general societal problem that has persisted since the 18th century," this historical inquiry is "straightforward."[21] But other regulations may require a

---

[19] *Have*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).
[20] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).
[21] *Id.* at 2131.

"more nuanced" approach.[22] In those cases, courts can reason by analogy, which involves finding a historical analogue—but not a "historical twin"—that is "relatively similar" to the modern regulation.[23] The Court's straightforward historical inquiry is first, starting with § 922(g)(8)'s enactment.

## A. The Violent Crime Control and Law Enforcement Act of 1994.

Section 922(g)(8) started as three separate bills in 1993. Senator Paul Wellstone and Representative Robert Torricelli, working closely with each other, proposed identical bills in the Senate and House of Representatives, respectively.[24] These proposals sought to restrict gun ownership of those subject to a restraining order and those convicted of a domestic violence misdemeanor.[25] Around the same time, Senator John Chafee proposed another version, which did not include a gun ban against misdemeanants, only prohibiting possession by those subject to a restraining order.[26] All three were submitted as amendments to the Omnibus Crime Bill, with § 922(g)(8)'s final form eventually making it into the Violent Crime Control and Law Enforcement Act of 1994.[27]

Almost all courts analyzing § 922(g)(8)'s constitutionality right after its passage upheld the statute by characterizing the "right to bear arms" as a collective right.[28] Thus, courts

---

[22] *Id.*

[23] *Id.*

[24] S. 1570, 103d Cong. (1993) (Senator Wellstone's bill); H.R. 3301, 103d Cong. (1993) (Representative Robert Torricell's bill).

[25] *Id.*

[26] S. 1607. 139 CONG. REC. S15,638 (daily ed. Nov. 10, 1993) (proposed as amendment 1169 to the Omnibus Crime Bill).

[27] Pub. L. 103-322, 108 Stat. 1796.

[28] *E.g.*, *United States v. Napier*, 233 F.3d 394, 402–03 (6th Cir. 2000) (rejecting Second Amendment challenge where defendant could not "show that § 922(g)(8) has some impact on the collective right of the militia"); *United States v. Bayles*, 151 F. Supp. 2d 1318, 1320–21 (D. Utah 2000) (rejecting Second Amendment challenge to section 922(g)(8)); *Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980) (citing, with approval, other opinions holding that section 922(g) does not violate Second Amendment).

believed that defendants had to prove that losing their gun rights affected the militia's "readiness."[29]

In any event, § 922(g)(8)'s history started in 1994—less than 30 years ago.[30] Or put another way, the company Amazon is older than the federal laws prohibiting someone subject to a court order from possessing a firearm, if only by a few months.

### B.  Protective orders are not much older than § 922(g)(8).

Even though § 922(g)(8) is still an adolescent by *Bruen*'s standards, the legal instruments that § 922(g)(8) covers aren't much older. Section 922(g)(8)'s first requirement is that the person is "subject to a court order." But court orders come in all types. So more specifically, § 922(g)(8) requires the court order to be one that restrains a person from "engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child."[31] This type of court order is more commonly known as a restraining order.

*Black's Law Dictionary* defines restraining orders as a "court order prohibiting family violence; esp., an order restricting a person from harassing, threatening, and sometimes merely contacting or approaching another specified person."[32]

Yet it wasn't until the mid- to late-1970s before states enacted laws enabling civil protection orders barring domestic abusers from further abusing the victim.[33] And it wasn't

---

[29] *United States v. Baer*, 235 F.3d 561, 564 (10th Cir. 2000) (rejecting Second Amendment challenge to section 922(g)(1), noting that "the circuits have consistently upheld the constitutionality of federal weapons regulations like [this one] absent evidence that they in any way affect the maintenance of a well regulated militia.")

[30] Pub. L. No. 103-322, § 110401, 108 Stat. 1796.

[31] § 922(g)(8)(B).

[32] *Restraining Order*, Black's Law Dictionary 1571 (Bryan A. Garner ed., 11th ed. 2019).

until the mid-1990s—around the time Congress created § 922(g)(8)—that every state had some sort of civil protection order statute.[34]

Protective orders for domestic violence then, are also a recent legal invention. And because they are so recent, a much deeper historical inquiry is needed to satisfy *Bruen*'s historical requirement. Thus, the Court's straightforward historical analysis digs deeper to uncover how this Nation has historically punished domestic abusers.

### C. How this Nation has historically punished domestic violence: seventeenth and eighteenth centuries.

This straightforward historical analysis, however, reveals a historical tradition likely unthinkable today. Domestic abusers are not new. But until the mid-1970s, government intervention—much less removing an individual's firearms—because of domestic violence practically did not exist.

A reason for that was how infrequently domestic abusers were prosecuted. For example, the Plymouth Colony court records from 1633 to 1802 represent the only jurisdiction where the prosecution of domestic violence has been studied over a long time frame.[35] And during that almost 200-year period, only 12 cases involving wife beating were prosecuted.[36] Zero complaints during that time were for child abuse.[37] Another study of the six New England colonies from 1630 to 1699 confirmed the same—only 57 wives and 128 husbands were tried on charges of assault. One explanation for such low prosecution

---

[33] Emily J. Sack, *Battered Women and the State: The Struggle for the Future of Domestic Violence Policy*, 2004 WIS. L. REV. 1657, 1667 (2004).

[34] *Id.*

[35] Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Fam. Violence 19, 25 (1989).

[36] *Id.*

[37] Elizabeth Pleck, Domestic Tyranny: The Making of American Social Policy Against Family Violence from Colonial Times to the Present 27 (1987)

numbers is that "a second judicial system, the church court, existed alongside the magistrate's court."[38] And church courts relied more on public shaming than anything else.[39]

That said, religious communities handed out the most severe consequences. Indeed, colonial New England, dominated by Puritans, imposed the harshest punishments on domestic violence offenders. For instance, a 1672 court sentenced a man convicted of abusing and beating his wife to be whipped with ten stripes or pay a five pounds monetary fine to the court.[40] Or around that same time, a Plymouth court sentenced a man to "sit in the stocks" after he pushed his wife off a stool.[41] But even then, the Puritans' belief in a strong, hierarchal family kept most disputes internal. As a result, the law was encouraged to side with maintaining the nuclear family—not separating the abuser from the victim through a prosecution.[42]

The Puritan's moral law, however, was not the British common law. And as society moved into the eighteenth century, Puritan morality dissipated. Indeed, like domestic violence historian Elizabeth Pleck stated, any prosecution of domestic violence charges at that point "were remnants of a much more extensive form of social policing that ended with the demise of the Puritan experiment."[43]

---

[38] Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Fam. Violence 19, 27 (1989).
[39] *Id.*
[40] Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn St. L. Rev. 337, 346 (2015).
[41] *Id.* at 346–47.
[42] Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Fam. Violence 19, 25 (1989).
[43] Elizabeth Pleck, Domestic Tyranny: The Making of American Social Policy Against Family Violence from Colonial Times to the Present 27 (1987).

### D. Nineteenth century and onward.

Another historical chunk comes from the nineteenth century. As society advanced, removing firearms from an abuser—through government intervention or otherwise—was still not a prevalent occurrence. For instance, one prominent scholar examined statutory materials and articles from major newspapers across eight states in the American West from 1860 to 1930.[44] And from that historical examination, the usual mode of punishment for domestic violence was a fine, with the most common being between $50–200.[45] Some offenders—although it was far less common—could receive a whipping or jail time. Consider the short period in the 1870s when the California penal code allowed an abuser to be punished with "not less than twenty-one lashes on the bare back."[46]

Yet even in the late nineteenth century, many states still adhered to the belief that without serious violence, the government should not interfere in familial affairs. In just one of many examples, the North Carolina Supreme Court stated as late as 1874 that "[i]f no permanent injury has been inflicted, nor malice, cruelty nor dangerous violence shown by the husband, it is better to draw the curtain, shut out the public gaze, and leave the parties to forget and forgive."[47] What's more, prominent domestic violence researchers agree that even into the early twentieth century, judges were "more likely to confiscate a wife beater's liquor than his guns."[48]

---

[44] Carolyn B. Ramsey, *Domestic Violence and State Intervention in the American West and Australia, 1860-1930*, 86 Ind. L.J. 185, 207 (2011).
[45] *Id.*
[46] An Act to Amend Section Two Hundred and Forty-Three of the Penal Code, ch. ccxc, § 1, 1876 Codes of California 110 (effective Apr. 21, 1876) (removed in 1881).
[47] *State v. Oliver*, 70 N.C. 60, 61-62 (1874).
[48] Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017).

This is not to say society encouraged or turned a blind eye toward spousal abuse. Quite the opposite. One judge in 1914 stated that "wife-beating is one of the most contemptible of crimes."[49] Or as another scholar recounts, private citizens sometimes rebuffed abusers. Indeed, railroad workers in 1886 responded to the sounds of an assault from a nearby home by accosting the husband and taking him to the stationhouse.[50] Or the woman who fended off a would-be abuser with a shotgun while harboring the battered wife in her home.[51] Or the tarring and feathering of abusive husbands.[52] Stories like these appear to have been common.

But glaringly absent from the historical record—from colonial times until 1994—are consistent examples of the government removing firearms from someone accused (or even convicted) of domestic violence.

## IV. The circuit courts' historical analysis under the old Second Amendment framework also shows a lack of historical evidence.

This Court's historical inquiry aligns with what almost all circuit courts realized pre-*Bruen*—historical restrictions on "who" may possess a firearm are almost nonexistent. Indeed, the Second Amendment framework courts used after *Heller* started with a historical analysis.

Under the old Second Amendment framework, the first step was for courts to establish the Second Amendment's original scope through a historical analysis.[53] So even

---

[49] Carolyn B. Ramsey, *Domestic Violence and State Intervention in the American West and Australia, 1860-1930*, 86 Ind. L.J. 185, 203 (2011).
[50] *Id.* at 209, n.128.
[51] *Id.* at 208–09.
[52] *Id.* at 209, n.129.
[53] *E.g.*, *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017).

though the cases are pre-*Bruen*, other circuit courts have looked at § 922(g)(8) (or similar statutes) through a historical lens and found little support.

The first example is the Tenth Circuit's opinion in *United States v. Reese*—a § 922(g)(8) case.[54] There, Reese's first wife had obtained a protective order against him.[55] And when police responded to a domestic disturbance call from Reese's second wife, they discovered he was in possession of firearms.[56] But even with disturbing facts, the *Reese* court determined that under the old Second Amendment framework's first step "there is little doubt that [§ 922(g)(8)] imposes a burden on conduct . . . that generally falls within the scope of the right guaranteed by the Second Amendment."[57]

Another example is the Ninth Circuit's opinion in *United States v. Chovan*.[58] Chovan was charged under § 922(g)(9), a similar statute that prohibits domestic violence misdemeanants from possessing firearms. After concluding the regulation burdened rights protected by the Second Amendment, the *Chovan* court was unpersuaded by the Government's argument that § 922(g)(9)'s prohibition was longstanding.[59] Like this Court did in *Quiroz* and *Collette*, the *Chovan* court noted that the first federal firearm restrictions regarding violent offenders were not passed until 1938.[60] And such restrictions were geared only toward violent offenders.

---

[54] 627 F.3d 792 (10th Cir. 2010), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111 (2022).
[55] *Id.* at 794.
[56] *Id.* at 795–96.
[57] *Id.* at 801.
[58] 735 F.3d 1127 (9th Cir. 2013).
[59] *Id.* at 1137.
[60] *Id.*; *see also United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Collette*, No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022).

What's more, the *Chovan* court concluded that "[b]ecause of 'the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors.'"[61] Thus, Chovan was entitled to the Second Amendment's protection.[62]

Yet another § 922(g)(9) pre-*Bruen* example comes from the Seventh Circuit in *United States v. Skoien*.[63] Skoien had been convicted in state court of a misdemeanor domestic battery.[64] A year later, Skoien's probation officer found a shotgun in a truck parked outside Skoien's house.[65] The Seventh Circuit at first vacated and remanded.[66] But on rehearing en banc, the Seventh Circuit upheld Skoien's conviction and § 922(g)(9)'s constitutionality.[67]

But it wasn't what the *Skoien*'s majority opinion said, it's what it didn't say that speaks loudest. Indeed, the majority opinion skipped right to the old Second Amendment framework's second step. And like Judge Sykes noted in her dissenting opinion, the second step is "necessary only if Skoien's Second Amendment rights are intact notwithstanding his domestic-violence conviction."[68] The court "simply cannot say with any certainty that persons convicted of a domestic-violence misdemeanor are wholly excluded from the Second Amendment right as originally understood."[69] Thus, by skipping the first step, and

---

[61] *Id.*

[62] *Id.* (Section 922(g)(9) was eventually upheld by the court after using intermediate scrutiny).

[63] 614 F.3d 638 (7th Cir. 2010).

[64] *Id.* at 639.

[65] *United States v. Skoien*, 587 F.3d 803, 805 (7th Cir. 2009), *reh'g en banc granted*, *opinion vacated*, No. 08-3770, 2010 WL 1267262 (7th Cir. Feb. 22, 2010), and *on reh'g en banc*, 614 F.3d 638 (7th Cir. 2010).

[66] *United States v. Skoien*, No. 08-3770, 2010 WL 1267262 (7th Cir. Feb. 22, 2010).

[67] *Skoien*, 614 F.3d at 645.

[68] *Id.* at 651 (Sykes, J., dissenting).

[69] *Id.*

applying a higher level of scrutiny in the second, the *Skoien* majority implied that history did not support a categorical prohibition of domestic violence misdemeanants.

After the Seventh Circuit's opinion in *Skoien*, the Fourth Circuit addressed § 922(g)(9) in *United States v. Chester*.[70] The *Chester* court noted the historical data was not conclusive, quoting Judge Sykes's dissent in *Skoien*.[71] In fact, much like this Court did in *Quiroz*, the *Chester* court reasoned that "[i]f the historical evidence on whether felons enjoyed the right to possess and carry arms is inconclusive, it would likely be even more so with respect to domestic-violence misdemeanants."[72] Indeed, "the federal provision disarming domestic-violence misdemeanants is of recent vintage, having been enacted in 1996."[73] Thus, the court concluded it was "certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors."[74]

Although the above circuit courts eventually upheld the regulations using means-end scrutiny, an approach since jettisoned by *Bruen*, a consistent theme was how little historical support the record contained. This Court has already held that some restrictions—like prohibiting felons from possessing firearms—are constitutional even without direct historical evidence. But if other § 922 restrictions—such as felon-in-possession—lack clear historical support, the Court questions, like the Fourth Circuit did in *Chester*, how solid the constitutional foundation is for other firearm regulations like § 922(g)(8).

---

[70] 628 F.3d 673 (4th Cir. 2010).
[71] *Id.* at 680; *see also United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022).
[72] *Id.* at 681.
[73] *Id.*
[74] *Id.*

V.     **The historical inquiry continued: reasoning by analogy.**

This Court, and other courts in the time between *Heller* and *Bruen*, uncovered little (if any) "straightforward" historical support for § 922(g)(8)'s proscriptions. Even the Government conceded in oral argument that the historical support for § 922(g)(8) is "thin." So the Court notes that a strict reading of *Bruen*—which instructs that "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment"—would seemingly bar this Court from analyzing further.[75] The Court's inquiry could stop here and arguably comply with *Bruen*'s demands.

The Court instead moves to the "more nuanced" approach outlined by *Bruen*. Under this approach, courts can analogize to historical regulations that are "relatively similar" to the modern regulation.[76]

**A.  How the Court reads the Second Amendment.**

The Government argues that § 922(g)(8) does not burden Second Amendment rights because only "law-abiding, responsible citizens" fall under the Second Amendment's protection.[77] To backstop that assertion, the Government reasons that "*Heller* and *Bruen* defined the right to keep and bear arms as belonging to 'law-abiding, responsible citizens.'"[78] To address that argument, the Court starts with the Second Amendment's plain text.

The Court reads the Second Amendment's operative clause—like Justice Scalia did in *Heller*—as containing three separate pieces:

---

[75] *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).
[76] *Id.* at 2132.
[77] Doc. 46 at 3.
[78] *Id.* (citing *D.C. v. Heller*, 554 U.S. 570, 635 (2008); *Bruen*, 142 S. Ct. at 2156).

"<u>The right of the people</u> / <u>to keep and bear Arms</u> / <u>shall not be infringed</u>."

Based on the Second Amendment's plain text, the Court sees only two ways a firearm regulation can survive *Bruen*'s scrutiny: (1) the "who" being regulated has historically been excluded from "the people," or (2) the conduct being regulated (the what, where, when, and how) has historically been excluded from "keep and bear Arms." If the regulation doesn't fall into either of those categories, the Second Amendment is unequivocal: the right "shall not be infringed."

Here, § 922(g)(8) regulates "who" can keep and bear arms. And the "who" imbued with the right to keep and bear arms is "the people"—a term of art. Thus, the threshold question is what does "the people" mean?

       *i.*   *"The people" means members of the political community.*

The Government claims "*Heller* and *Bruen* defined the right to keep and bear arms as belonging to 'law-abiding, responsible citizens.'"[79] Thus, they argue because of the Court Order and Restraining Order, Defendant is not a "law-abiding citizen" and is not protected by the Second Amendment.[80] The Court disagrees with that reading for many reasons but limits itself to three. First, the crux of *Heller*'s reasoning—that the Second Amendment enshrined an individual right—highlights that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all *members of the political community*, not an unspecified subset."[81] So the *Heller* Court's "determination of a matter of

---

[79] *Id.*
[80] *Id.* at 5.
[81] *Heller*, 554 U.S. at 580 (emphasis added).

17

law pivotal to its decision" defined "the people" as "members of the political community," not "law-abiding, responsible citizens."[82]

Second, history supports Justice Scalia's "members of the political community" definition. For example, at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called "political rights."[83]

Third, like Justice Stevens noted in his *Heller* dissent, if "the people" is restricted to "law-abiding, responsible citizens," and "the people" means the same group in the First and Fourth Amendments, those other constitutional protections are endangered.[84] Indeed, "the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions."[85]

Taking Justice Stevens' argument further, defining "the people" as law-abiding, responsible citizens would lead to absurd results. Surely the Government doesn't believe that someone ticketed for speeding—thus, not abiding by the law—should lose their Second Amendment rights. Nor should the person who negligently (irresponsibly) forgets to set out the "Wet Floor" sign after mopping lose their Second Amendment rights. Of course not. This Court doesn't think the Government wants such results, but the absurd consequences are there all the same.

---

[82] Bryan A. Garner, et al., The Law of Judicial Precedent 44 (2016) (quoting *Dicta*, Black's Law Dictionary 849 (Bryan A. Garner ed., 10th ed. 2014).
[83] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[84] *Heller*, 544 U.S. at 644 (Stevens, J. dissenting).
[85] *Id.*

**B. Historical analogy to surety statutes.**

Another argument the Government makes is that § 922(g)(8) is analogous to historical surety laws because "surety laws imposed protections, sometimes including a restriction on firearm possession, where a person was reasonably likely to injure another or to breach the peace."[86] The Government's analogy to surety laws, however, fails on three fronts.

First, the Government cites William Blackstone's commentaries that advocated for a "surety of the peace" against a person causing or threatening violence against another.[87] Yet the Government ignores Blackstone's analysis—from the very same commentaries—that in comparison to crimes of public mischief, private vices (like spousal disputes) lay outside the law's legitimate domain.[88] As one example, Blackstone noted the difference between public intoxication and intoxication in one's home.[89] Although both public and private vices are subject to "eternal justice," only public vices were subject to "the temporal punishments of human tribunals."[90]

Second, the Government notes that a surety was "either a money payment or pledge by others 'in support of his future good conduct.'"[91] Notably absent then, is where

---

[86] Doc. 46 at 12.

[87] *Id.*

[88] 4 W. Blackstone, Commentaries on the Laws of England 41 (1769) (All crimes ought therefore to be estimated merely according to the mischiefs which they produce in civil society: and, of consequence, private vices, or the breach of mere absolute duties, which man is bound to perform considered only as an individual, are not, cannot be, the object of any municipal law; any farther than as by their evil example, or other pernicious effects, they may prejudice the community, and thereby become a species of public crimes).

[89] *Id.* at 42 (Thus the vice of drunkenness, if committed privately and alone, is beyond the knowledge and of course beyond the reach of human tribunals: but if committed publicly, in the face of the world, its evil example makes it liable to temporal censures).

[90] *Id.*

[91] Doc. 46 at 11 (quoting *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), vacated 2022 WL 2347578 (U.S. June 30, 2022).

someone's guns were confiscated as a surety. Nothing the Government presents as historical evidence reveals that sureties were being used to strip guns from the accused. And even the Government admits sureties, in their most potent form, were only a "possible disarmament" if the person violated the surety.[92]

The Government attempts to deliver such historical proof by citing the Sundry Acts of Parliament in 1771, which in the colonies could "'upon *confession*' or '*legal proof of the offense* . . . cause [the accused's] arms or weapons to be taken away.'"[93] The Court agrees: Only after they confessed, or a jury found them guilty through a constitutional process, would they lose an enumerated right.

Lastly, the Government argues that § 922(g)(8) has more procedural safeguards than surety laws because a surety could be based on another's oath alone.[94] In contrast, the Government argues that "§ 922(g)(8) requires a court to find a 'credible threat to physical safety' of an intimate partner or child." But the Government seemingly forgets that Defendant's Court Order *did not find a credible threat to someone else's physical safety*.[95] The Court Order instead—as allowed by § 922(g)(8)—explicitly prohibited Defendant from committing or threatening to commit violent acts. And even if the Court Order did find a credible threat, the Court questions how 922(g)(8), which completely revokes the constitutionally protected conduct of possession, is less restrictive than a surety statute, which required "either a money payment or pledge by others 'in support of his future good conduct.'"[96]

---

[92] *Id.* at 12.
[93] *Id.* (emphasis added).
[94] *Id.* at 13.
[95] *Id.* Ex. 1.
[96] *Young* , 992 F.3d at 791 n.12 (quoting David Feldman, *The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers*, 47 CAMBRIDGE L.J. 101, 104 (1988)).

*Bruen* is clear: if a challenged regulation addresses a "general societal problem that has persisted since the 18th century," and "earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."[97] Domestic violence, or violence against anyone for that matter, is not just a modern problem. So by analogizing the "material different" ways § 922(g)(8) and surety statutes handled the same "societal problem," the Government undercuts its argument, thus taking the wind out of its own sails.

### C.  Historical analogy to disarming "dangerous" people.

The Government also hangs its historical argument on the idea that there is a historical tradition of disarming "dangerous persons."[98] The Government cites debates from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions, "which were considered 'highly influential' by the Supreme Court in *Heller*."[99]

In the Pennsylvania convention, the influential Pennsylvania Minority suggested that the right to arms be guaranteed "unless for crimes committed, or *real danger of public injury* from individuals."[100] The Massachusetts convention's proposed amendment was that the Second Amendment "be never construed to authorize Congress . . . to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms."[101] Likewise, one

---

[97] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).
[98] Doc. 46 at 6.
[99] *Binderup v. Attorney Gen. U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments).
[100] *Kanter v. Barr*, 919 F.3d 437, 455 (7th Cir. 2019) (Barrett, J., Dissenting) (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681 (1971) (emphasis added).
[101] Bernard Schwartz, The Bill of Rights: A Documentary History 674–75, 681 (1971) (emphasis added).

of New Hampshire's proposed amendments was that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."[102]

But those proposed amendments were just that: proposed. In the Seventh Circuit's *Kanter v. Barr*, now-Justice Barrett's dissent noted four problems with using those conventions as evidence of the founder's intent:

(1) None of the relevant limiting language from those conventions made its way into the Second Amendment;

(2) New Hampshire's proposal—the least restrictive of the three—was the only proposal to carry a majority of its convention;

(3) proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion; and

(4) similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment.[103]

At the same time, Justice Barrett did state that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." And the Government is correct to quote it.[104] This Court's leap of faith, however, is not that the colonies wished to keep the public safe from those seen as "dangerous"—history supports that proposition. Rather the leap of faith is whether the colonies considered domestic abusers a "threat to *public safety*." The Government and the Court's historical inquiries above don't support that conclusion.

---

[102] *Id.*
[103] *Kanter v. Barr*, 919 F.3d at 455.
[104] Doc. 46 at 8.

**D. Historical analogy to disarming the politically disloyal.**

The Government makes a final historical analogy to the colonies disarming those unwilling to take an oath of allegiance.[105] In the mid- to late-1770s, several states allowed guns to be confiscated from all persons refusing to take allegiance oaths.[106] Thus, the Government reasons, there is a history of disarming those the government perceives as a "threat."

Punishment for failing to display the proper political affiliation, however, was what the Second Amendment was meant to deter. Indeed, with British tyranny still fresh on their minds, the founders understood that "[t]o preserve liberty, it is essential that the whole body of people always possess arms, and be taught alike, especially when young, how to use them."[107] Or as Noah Webster put it: "The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed."[108]

And the Government's allegiance-oath analogy could be used elsewhere. Consider how those burning the United States flag could be disarmed because history supports disarming those disloyal to the government. The Supreme Court has already upheld the First Amendment rights of those burning American flags.[109] But if the Second Amendment can be read separate from the First as the Government argues, the history of disarming someone

---

[105] *Id.*

[106] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 265 (2020) (e.g., in 1777, North Carolina stripped "all Persons failing or refusing to take the Oath of Allegiance" of any citizenship rights).

[107] Richard Henry Lee, *Additional Letters from the Federal Farmer* 170 (1788).

[108] Noah Webster, *An Examination into the Leading Principles of the Federal Constitution, in* Pamphlets on the Constitution of the United States 56 (Ford ed. 1888).

[109] *Texas v. Johnson*, 491 U.S 397 (1989).

because of political allegiance oaths could be used to justify disarming political dissidents today.

### E. The Court's historical analogy to other constitutional provisions.

This Court upheld other firearm regulations—even when the direct history was unconvincing—by analogizing to other constitutional provisions. Like the Court reasoned above, Justice Scalia's majority opinion in *Heller* defined "the people" as unambiguously referring to "all members of the political community, not an unspecified subset."[110] And history supports defining "the people" as "members of the political community" because the Second Amendment was thought equal to other so-called "political rights" like the right to vote, hold public office, or serve on a jury.[111]

*Heller* also stated that "the people" means the same thing throughout the Constitution.[112] Indeed, both *Heller* and *Bruen* recognize a consistent usage within the Constitution.[113] Therefore, if the meaning is the same throughout the Constitution, other constitutional provisions enshrining rights or powers to "the people"—and critically, who can be categorically excluded from "the people"—provide similar historical analogues.

*i.   Section 2, Article I and the First Amendment.*

In other § 922 cases, the Court has analogized "the people" in the Second Amendment to two other constitutional provisions: Section 2, Article I and the First Amendment. Section 2, Article I contains the power of "the people" to vote for the House

---

[110] *D.C. v. Heller*, 554 U.S. 570, 580 (2008) (emphasis added).
[111] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[112] *D.C. v. Heller*, 554 U.S. 570, 580 (2008).
[113] *Id*; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).

of Representatives.[114] And since 1792, states have excluded from that right those who have committed crimes—a "relatively similar" regulation to prohibiting felons from possessing guns.[115] Thus, if the definition of "the people" is consistent throughout the Constitution— and it has been historically constitutional to exclude those convicted of a crime from "the people" under Section 2, Article I—it would also be constitutional then to exclude those groups from the Second Amendment's kindred "political right."[116]

The Court also analogized to the First Amendment's "right of the people peaceably to assemble, and to petition the government for a redress of grievances."[117] Although the exclusion cannot be used as prior restraint, the Supreme Court has held that the Government can restrict the right to assembly when there is a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order."[118]

Those subject to a court order, however, do not fit so neatly under the constitutional provisions above. Felons, for example, have already been convicted by a jury through a constitutional process; that's not the case with those subject to a court order, as addressed here. And those who exploit their First Amendment rights for violence can be excluded; § 922(g)(8) doesn't require that the Second Amendment right to keep and bear arms be exploited. So both provisions do not provide similar-enough analogues.

---

[114] U.S. Const. art. I, § 2, cl. 1.

[115] *See, e.g., United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, *6 (W.D. Tex. Oct. 3, 2022) (citing Kentucky Const. art. VIII § 1.2 (1792)).

[116] *Id.*

[117] U.S. Const. Amend. I.

[118] *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940).

In short, the historical record does not contain evidence sufficient to support the federal government's disarmament of domestic abusers. And without historical support, § 922(g)(8) does not overcome *Bruen*'s presumption that the Second Amendment protects an individual's possession of a firearm. Thus, § 922(g)(8) is unconstitutional.[119]

## VI.   Scalpel or chainsaw?

Finding historical analogies is difficult. Likewise, the Court doesn't pretend that analogizing to other constitutional provisions is a perfect fit. If the Court analogizes to uphold a regulation, some will say it's the Court's attempt to circumvent *Bruen*'s framework. And if the Court analogizes the other way, some will argue that the Court is cherry-picking history to fulfill a contrary agenda. The Court believes both arguments miss the mark. But therein lies the point.

Like the Court noted at the beginning, the critical question lower courts now face is whether *Bruen* requires the regulatory landscape be trimmed with a scalpel or a chainsaw. Justice Thomas made clear that courts post-*Heller* failed to engage in the necessary constitutional analysis, deferring too often to the legislature through intermediate scrutiny.[120] This Court concedes that such deference made *Bruen* necessary. But how strict—or loose— an interpretation *Bruen* requires hasn't been clarified, leaving important questions.

If the historical analysis must be so tightly constrained to historical analogies involving categorical restrictions of *only* the specific group regulated (e.g., those subject to a court order), there are likely very few (if any) modern firearm regulations that will survive.

---

[119] The Court need not reach Defendant's as-applied claim because § 922(g)(8) is facially unconstitutional.
[120] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

That may have been *Bruen*'s point. But such a strict interpretation would seem to turn the historical analysis into the "regulatory straitjacket" shunned by *Bruen*.[121]

The Court noted its concerns with reading *Bruen* so strictly in its *Quiroz* opinion.[122] There, the Court highlighted the heavy burden the historical analysis places on the Government, especially when around 1791, firearms represented tools to protect a homestead in the wilderness and to hunt for food.[123] The Court also expounded on those concerns when upholding the felon-in-possession law's constitutionality.[124] Those concerns bear repeating here.

For one thing, one could easily imagine a scenario where separate courts can come to different conclusions on a law's constitutionality, but both courts would be right under *Bruen*. Say the Government in Court A develops an in-depth historical analysis to uphold a regulation, and Court A finds that the Government met the burden imposed by *Bruen*'s step two. The Government in Court B, in contrast, could face the same regulation as in Court A on the same day, but develop no analysis or fail to respond at all. An inflexible reading of *Bruen* then, would require Court B to declare the regulation unconstitutional. On that basis, the same regulation gets different results based on how adept at historical research the Government's attorneys are in a particular location or the time they have to devote to the task.

What's more, because most gun regulations are relatively new, the Second Amendment's jurisprudence is underdeveloped compared to other constitutional provisions.

---

[121] *Id.* at 2133.
[122] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, *8 (W.D. Tex. Sept. 19, 2022).
[123] *Id.* at *8.
[124] *See United States v. Charles*

It wasn't until *Heller* in 2008 that the individual right to keep and bear arms was solidified.[125] And the Second Amendment wasn't incorporated against the states through the Fourteenth Amendment's Due Process Clause until *McDonald* in 2010—almost 100 years after the First Amendment was incorporated.[126] Thus, analyzing the Second Amendment through a historical lens as an individual right, applicable against the states, has only been around for some 14 years. Or put another way, the Supreme Court's jurisprudence that the Second Amendment enshrines an individual right is younger than Twitter, Facebook, or YouTube.

## VII.   Other issues: court orders and speedy trial.

### A.  Piggybacking off state court orders.

This Court's opinion says nothing about whether a state court could remove someone's guns through conditions of release or a restraining order. But by piggybacking off a state court's order, § 922(g)(8) has other problems besides its lack of supporting history.

Take television host David Letterman's experience, for example.[127] In 2005, a disturbed woman, whom Letterman had never met, obtained a protective order against him from a state court because Letterman's presence on television harassed her.[128] And when asked why it had issued the restraining order, the state court said it was because the woman had filled out the restraining-order request form correctly.[129]

---

[125] *D.C. v. Heller*, 554 U.S. 570 (2008).

[126] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *Gitlow v. New York*, 268 U.S. 652 (1925).

[127] Peter Slocum, *Biting the D.V. Bullet: Are Domestic-Violence Restraining Orders Trampling on Second Amendment Rights?*, 40 SETON HALL L. REV. 639, 639 (2010).

[128] Gregory A. Hession, *Restraining Orders Out of Control*, NEW AM., Aug. 4, 2008, at 12, 12, available at http://thenewamerican.com/usnews/crime/173-restraining-orders-out-of-control.

[129] *Id.*

More importantly, Letterman was never notified of the order entered against him.[130] So although the order was eventually dismissed, if Letterman had possessed a firearm when the court entered the order without his knowledge, was he now a felon under § 922(g)(8)?

Another problem is that § 922(g)(8) prohibits possession of a gun even if the state court order doesn't. Indeed, § 922(g)(8) does not require that the court order prohibit possessing a gun. Thus, § 922(g)(8) sometimes creates a felony for an act (possession) that would not even violate the state order.

Some will argue vehemently that ruling § 922(g)(8) unconstitutional only encourages more domestic violence. Or, like others have put more bluntly, the Court will be responsible for any heinous acts of violence. But that argument lacks merit.

Yet the Court notes that even if § 922(g)(8) is trimmed from the Second Amendment, state court orders still exist. Indeed, the piece of paper that says, "abuser shall not harass, stalk, threaten, approach, or interact with victim" is still effective. So whether or not § 922(g)(8) exists, states still can (and should) make it unlawful to violate restraining orders. In fact, Kentucky state law makes it a crime to violate the conditions of a protective order.[131] It follows then that Kentucky authorities could still arrest Defendant and prosecute him.

It's also ridiculous to argue that a second piece of paper, one charging a violation of § 922(g)(8), magically prevents the alleged-abuser from violating the first piece of paper. If that were reality, this case wouldn't be before the Court. Again, states should punish abusers with the full force of the law. But that does not mean the Government historically has been

---

[130] *Id.*
[131] Ky. Rev. Stat. Ann. § 403.763(4)(b) ("Violation of an order of protection is a Class A misdemeanor").

able to piggyback off state laws to prohibit conduct protected under the Second Amendment.

### B. A defendant's right to a speedy trial.

Few courts have ruled thus far on challenges to various § 922 restrictions post-*Bruen*. The case presented here is this Court's sixth—with four more pending, a number that is sure to grow. Some might wonder if the Court has more cases challenging the constitutionality of various § 922 regulations than other courts in the wake of *Bruen*. The Court does not believe it is so burdened.

Other constitutional protections separate from the Second Amendment exist. Indeed, although this case, and other cases involving § 922 regulations, present Second Amendment issues, other constitutional rights are likewise impacted; for example, a criminal defendant's right to a speedy resolution of the case.

To the layperson, the concept of a speedy trial may be new. Under the Sixth Amendment, a criminal defendant "shall enjoy the right to a speedy and public trial." Put simply, under the Sixth Amendment and federal law, a criminal defendant's trial must start within 70 days after return of an indictment.[132] Starting the trial within a certain time frame—the "speedy trial clock"—protects our constitutional rights and prevents indefinite detention.

But there are exceptions, and if a defendant moves to dismiss the indictment—as is the case here and in other cases challenging the constitutionality of a statute before trial—the

---

[132] 18 U.S.C. § 3161(c)(1).

speedy trial clock is paused.[133] When an accused challenges a gun regulation's constitutionality, if in custody, they remain so until the court rules on the motion—so in other words, indefinitely.

Defendant's speedy trial clock is paused, and while the Court would be more comfortable waiting until the courts form a consensus on interpretation post-*Bruen*, it cannot wait, believing that a criminal defendant's Sixth Amendment right to a speedy trial deserves the same reverence and protection as another's right to keep and bear arms under the Second.

## CONCLUSION

How strictly or flexibly a court reads *Bruen* impacts its conclusion. *Bruen*'s mandate is that a gun regulation's constitutionality hinge solely on the historical inquiry. According to *Bruen*, that can be this Court's only consideration. The Court concedes, therefore, that a court reading *Bruen* strictly could have arguably stopped after Section IV of this Opinion.

That said, this Court embraces *Bruen*'s charge. Thus, after sifting through the history above, this Court finds that the Government did not prove that § 922(g)(8) aligns with this Nation's historical tradition of firearm regulation and declines the Government's invitation to insert its own public policy concerns rather than following *Bruen*. As a result, the Court holds that § 922(g)(8) is unconstitutional under *Bruen*'s framework.

---

[133] § 3161(h)(1)(D).

It is therefore **ORDERED** that Defendant's Motion to Dismiss Indictment be **GRANTED**. (Doc. 30).

It is so **ORDERED**.

SIGNED this 10th day of November, 2022.

_____
DAVID  COUNTS
UNITED STATES DISTRICT JUDGE